361 So.2d 234 (1978)
ECONOMY CARPETS MANUFACTURERS & DISTRIBUTORS, INC.
v.
BETTER BUSINESS BUREAU OF BATON ROUGE AREA, INC., and St. Paul Fire and Marine Insurance Company.
No. 11748.
Court of Appeal of Louisiana, First Circuit.
July 10, 1978.
*235 D. Bert Garraway, Bart Eaton, Baton Rouge, of counsel for plaintiff-appellant Economy Carpets Manufacturers and Distributors, Inc.
Donald T. W. Phelps, Baton Rouge, of counsel for defendant-appellant Better Business Bureau of Baton Rouge, Inc., et al.
Anthony J. Clesi, Jr., Baton Rouge, of counsel for defendant-appellant St. Paul Fire and Marine Ins. Co.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Defendants, Better Business Bureau of Baton Rouge Area, Inc. (BBB) and its insurer, St. Paul Fire and Marine Insurance Company (St. Paul), (Appellants), appeal from judgment dismissing their exceptions of no cause of action to the defamation suit filed against them by Economy Carpets Manufacturers & Distributors, Inc. (Economy), (Appellee), and from judgment in favor of Economy for damages awarded pursuant to jury verdict finding BBB guilty of defamation. Economy has appealed, seeking an increase in the award for defamation and also for damages for alleged conspiracy by BBB to restrain trade, which latter claim was rejected by the jury. We affirm the judgment denying Economy damages for alleged restraint of trade. We reverse the judgment in favor of Economy for damages for defamation and dismiss Economy's claim in toto.
By original petition filed May 9,1975, and five supplemental and amending petitions, Economy sued BBB, St. Paul and numerous other defendants, including the State of Louisiana, Through the Governor's Office of Consumer Protection, seeking damages for defamation resulting from a BBB Special Bulletin published in October, 1974, and alleged conspiracy by defendants to restrain trade in violation of La. R.S. 51:122. After numerous legal maneuvers, Economy dismissed its action as to all defendants except BBB and St. Paul, which parties filed peremptory exceptions of no cause of action. The exceptions are based on the contention that the bulletin in question contained no language capable of having a defamatory meaning and that the bulletin was privileged *236 under the First Amendment to the United States Constitution. The trial judge dismissed the exceptions of no cause of action, and the matter went to trial on the merits against BBB and St. Paul on the issues of defamation and restraint of trade. The jury rendered a verdict in favor of Economy for $1,000,000.00 on the defamation charge, but rejected Economy's claims for damages for alleged restraint of trade. Economy appealed. BBB and St. Paul timely applied for a new trial. Following applications by BBB and St. Paul for writs, this court instructed the trial judge that he could entertain the applications for new trial despite the prior appeal by Economy. A new trial was granted BBB and St. Paul restricted to the issue of damages for defamation. The trial judge reduced damages to $30,000.00 from which judgment Appellants appealed.
BBB and St. Paul allege error as follows: (1) the jury was manifestly wrong in finding that the Special Bulletin was defamatory; that the statements therein were not true; and, that the publication was not privileged; (2) the trial judge was wrong in refusing to admit in evidence the record of a suit brought against Economy by the Attorney General, State of Louisiana, which record includes, inter alia, an injunction prohibiting Economy from engaging in certain specific advertising practices, despite the trial judge having allowed Economy to introduce in evidence an Assurance of Voluntary Compliance (AVC) signed by Economy as a result of the Attorney General's suit; and (3) the trial judge erred in instructing the jury on negligence and fault and refusing to instruct that malice, actual or implied, is an essential element of defamation.
Economy urges as error: (1) the trial judge's reduction of the jury award from $1,000,000.00 to $30,000.00; (2) the trial judge erred in instructing the jury that for BBB to be guilty of conspiracy, conspiracy must be shown between BBB and other parties and refusing to instruct the jury that a corporation and its own officers may be guilty of conspiracy without the participation of others; (3) the trial judge erred in giving instructions which in effect limited jury consideration of the issue of defamation to the October, 1974 Special Bulletin; and, (4) the trial judge's refusal to instruct the jury that improper motive or evil intent is not necessary to constitute a violation of La. R.S. 51:122.

BACKGROUND INFORMATION
BBB is a voluntary non-profit corporation with a membership of merchants, business men, professionals, tradesmen, industries and individuals and concerns furnishing personal services to the public. It is essentially a consumer information service. Although there are such bureaus in cities throughout the nation, each such bureau is a separate entity chartered by local business interests. BBB has a membership of approximately 1300 individuals and concerns. It operates on an annual budget of approximately $160,000.00 provided by fees ranging from an annual minimum of $100.00 for individuals and small concerns to a graduated maximum of several times that amount for corporations, depending upon the number of corporate employees. It has a President, Vice President and an office staff of five employees consisting of secretaries, stenographers and file clerks. The objectives of BBB are to: (1) promote and assist in maintaining truth, honesty and accuracy in business selling practices and increase and justify public confidence in the printed and spoken word of business; (2) advocate and assist in maintaining fair competition in business; (3) inform and educate the public to the difference between honest and legitimate advertising and selling and that which is dishonest and improper, and by all proper means prevent the public from being misled and taken advantage of by unfair advertising practices; (4) cooperate with other such organizations having the same objectives; (5) cooperate *237 with and assist duly constituted authorities in matters involved in accomplishing the above objectives; and (6) do all necessary to carry out the purposes of the organization.
To accomplish these objectives, BBB maintains a file on each of its members and such non-member businesses in the community as it can with the staff and funds available. Because of its financial limitation, it is to some degree selective in keeping files on non-member businesses. It endeavors, however, to keep as many files as possible, but addresses itself to those situations which in its judgment are most important. It is especially interested in and gathers information about new businesses. It addresses inquiries and makes suggestions and recommendations concerning advertising and business practices to members and non-member concerns alike when its attention is directed to some alleged improper advertising or business practice, whether by consumer complaint or its own continuous monitoring of newspaper, television commercials, radio and other media forms of advertising.
BBB receives requests for information from similar organizations in other communities throughout the nation. It also receives from members and non-members alike, hundreds of requests for information concerning businesses in the Baton Rouge trade area. In addition, it receives innumerable complaints, written and oral, from members and non-members, of alleged misleading advertising and questionable business practices by member and non-member businesses in Baton Rouge. An attempt is made to investigate each complaint by contacting the alleged offender and requesting an explanation of the alleged misconduct. Such requests are often made in writing and sometimes by telephone or personal contact. A precise record is kept of each complaint, the action taken thereon, and the response thereto. In most instances, a single letter or contact pointing out the nature of the complaint and suggesting which corrective measures should be taken results in cessation of the conduct or practice involved. BBB has no regulatory or enforcement authority. When persuasion and suggestion fail to terminate a practice deemed detrimental to the consumer public, BBB refers the matter to such regulatory agency as it deems best suited to handle the particular problem. The alleged offender is notified of the referral, which is usually to some agency such as the Federal Trade Commission, the Governor's Office of Consumer Protection or the Attorney General of Louisiana. The referral agency is given a report of the problem and requested to investigate and invoke its regulatory and enforcement authority, if warranted.
As a further service, BBB issues approximately eight bulletins each year. These publications inform that a particularly troublesome problem exists with a given business, agency or industry which has failed to correct the subject matter of complaints or practices which the BBB has found questionable. The bulletins alert members and consumers to the problem, the efforts of BBB to halt the impropriety, and the response or lack thereof on the part of the business involved. In addition to these regular bulletins, BBB issues two or three Special Bulletins each year, dealing with matters it considers of grave concern and regarding which it has been unable to obtain satisfactory explanation or solution.
In January, 1969, Jesse Jarreau began operation of a retail carpet establishment under the name of Economy Carpets, Inc., which concern became a BBB member. Jarreau ran the business until 1973, when his establishment was destroyed by fire and he lost his entire stock. Jarreau's sister, Mrs. Joyce Langlois, was an employee of Economy Carpets, Inc. After the fire, the business went into bankruptcy. Thereafter, Jarreau and his sister renewed retail carpet selling as Carpet Distributors, Inc. (Distributors). In late 1973, or early 1974, Jarreau purchased a carpet making loom and had it installed in Distributors' warehouse. Subsequently, Distributors became Economy *238 Carpets Manufacturers and Distributors, Inc., a corporation wholly owned by Mrs. Langlois. Although Jarreau stoutly disclaims any interest or ownership in Economy (claiming to be only an employee), Jarreau has run and has had complete control of both Distributors and Economy, the same as he had with the predecessor firm, Economy Carpets, Inc. Neither Distributors nor Economy have ever been BBB members.
With the advent of Distributors, disputes arose between Jarreau and BBB concerning information given by BBB to inquiries concerning Distributors. BBB responded to such inquiries by advising that Distributors was owned by Mrs. Langlois, who had previously worked for Economy Carpets, Inc., which concern had gone bankrupt. Through its attorneys, Distributors requested BBB to cease informing inquirers that Distributors was the successor to Economy Carpets, Inc., and that Economy Carpets, Inc. had gone into bankruptcy.
On January 7, 1974, Charles Dale Ramirez, Vice President of BBB, wrote Mrs. Langlois an inquisitorial letter concerning comparison price advertising by Distributors, in which advertisement articles were offered for reportedly reduced prices, using a former price comparison. Such an ad would be improper unless the basic comparison price quoted was the actual price for which the article sold formerly. Ramirez wrote the letter on his own initiative after reading an ad in a Sunday newspaper. On March 6, 1974, Ramirez wrote concerning an ad by Distributors offering to carpet any room regardless of size for $149.00 and customer complaints that Distributors could not or would not make good on the offer. The letter contained the names and addresses of the complainants. On April 9, 1974, Ramirez wrote in reference to a customer complaint received April 8, from a prospective purchaser who attempted to buy a remnant offered in an ad published April 7. The customer reported inability to buy the remnant advertised despite having gone to the store early on the morning of the 8th. This letter also noted that Economy was now claiming to be a carpet manufacturer from whom carpet could be purchased directly as from a mill, with no intervening middleman. By letter dated May 9, 1974, Ramirez expressed concern over an Economy ad of May 5 indicating a sale of remnants of carpeting made by Economy in its own mill. On August 29, 1974, Ramirez took issue with a television commercial in which Jarreau appeared and indicated that Economy was making thousands and thousands of yards of carpet in its Baton Rouge warehouse, and which ad showed a carpet loom operating in the background. This letter also questioned a newspaper ad in which Economy offered $7.50 per yard carpet for $1.88 per yard; $5.00 per yard carpet for $1.00 per yard; and, $6.00 per yard carpet for $1.50 per yard. Ramirez expressed doubt that Economy was making thousands and thousands of yards of carpet as claimed, and requested verification in the form of the names of the companies which applied secondary backing to the raw carpet made by Economy, invoices for materials purchased to make carpeting, and sales slips showing the sale of carpeting made by Economy. In addition to the television commercial and newspaper ad, Ramirez' last inquiry was prompted by visits which he and other BBB employees made to Economy's premises where a single carpet loom was observed in the warehouse, but was never found to be in operation. BBB received no response to any of its five letters of inquiry.
Based on the unanswered correspondence, verbal and written complaints from customers, and shopping episodes by decoy shoppers sent out by himself, Ramirez became convinced that Jarreau would not cease what Ramirez considered to be deceptive and misleading advertisement, bait and switch business practices and false claims of being a carpet manufacturer. Ramirez published a BBB Special Bulletin dated November, 1974, and entitled: "BBB Questions Economy Carpets Ads", which bulletin is reproduced in full and attached hereto.
*239 Approximately 13,500 copies of the bulletin were distributed by BBB through its regular channels, namely, to BBB members and other interested persons and organizations, including the Governor's Office of Consumer Protection and the Attorney General, State of Louisiana. No copies of the bulletin were released by BBB to any news media. The bulletin gained widespread circulation in the Baton Rouge area. There is some evidence of the bulletin being found in Georgia, which the record shows to be the carpet making center of the nation.
On November 5, 1974, Ramirez wrote a letter to Charles W. Tapp, Director, Governor's Office of Consumer Protection, requesting an investigation of suspected bait and switch advertising by Economy, based on consumer complaints and Mrs. Langlois' failure to respond to any of Ramirez' written inquiries. In turn, Tapp referred the matter to the Attorney General. Negotiations between Tapp, the Attorney General's Office and Jarreau resulted in an Assurance of Voluntary Compliance being signed by Jarreau on February 11, 1975, as the solution of an action brought by the Attorney General's Office against Economy. In the AVC, Jarreau, on behalf of Economy, agreed to changes in the advertisement concerning comparative prices and claims of never being undersold. On February 12, 1975, Tapp received a letter from Ramirez questioning Economy's claim of manufacturing "thousands and thousands of yards of carpeting" in Economy's Baton Rouge mill. Ramirez also suggested that Tapp obtain another AVC from Jarreau concerning the claim that Economy was a manufacturer of carpeting. The manufacturing claim was negotiated for some time between Tapp and Jarreau with little or no cooperation from Jarreau insofar as concerned the supply of information requested by Tapp to substantiate the claim that Economy manufactured a large part of the carpeting it sold. Ultimately, the issue was resolved by Tapp agreeing to an AVC signed by Jarreau on January 7, 1976, which stated in effect that Economy could advertise production of 15% of the carpet it sold, and that said figure was subject to change. Tapp testified he was never shown production figures requested of Jarreau but that he agreed to the second AVC merely to settle the issue. Subsequently, an injunction was sought and issued against Economy in the suit brought by the Attorney General. The injunction prohibited Economy from advertising that it was making a substantial amount of the carpet it sold. The trial court prohibited Appellants from introducing in evidence the proceedings against Economy and the action taken therein despite having allowed Economy to introduce the AVC in evidence. Appellants proffered the record. We find that the trial judge erred in refusing to admit the record and that the record should be considered.

THE EXCEPTIONS OF NO CAUSE OF ACTION
BBB's exception asserts that the petition herein fails to allege facts sufficient to support a finding of conspiracy pursuant to La. R.S. 51:122. The basis of St. Paul's exception is that the language in the Special Bulletin of October, 1974 is neither defamatory nor capable of defamatory interpretation.
Although the facts alleged as constituting conspiracy in restraint of trade are vague, the exception of BBB must be denied because an interpretation of the allegations most favorable to Economy does support a cause of action pursuant to La. R.S. 51:122.
St. Paul's exception presents a more complex issue. When this matter was tried, our Supreme Court had not rendered its decision in Mashburn v. Collin, 355 So.2d 879 (La.1977). Mashburn held that a defendant in a defamation suit, who is expressing an opinion as opposed to making a *240 statement of fact, is entitled to a "fair comment privilege". Interpreting the United States Supreme Court decisions in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), our Supreme Court stated in Mashburn: "In the Gertz decision it is strongly indicated that the Court, in relaxing the stringent test of the New York Times rule in cases brought by private individuals, was speaking in terms only of libelous misstatements of fact, and that mere comment or opinion on public matters, even though defamatory, enjoys the unqualified protection of the First Amendment." See also Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). Mashburn also noted: "We conclude, therefore, that the First Amendment freedoms as defined by the New York Times-Gertz series of decisions afford[s], at the very least, a defense against defamation actions for expressions of opinion about matters of public concern made without knowing or reckless falsity". 355 So.2d 879, 885. Mashburn requires the following inquiries: (1) Does the Special Bulletin constitute opinion; (2) Does it contain any misstatement of fact; (3) Was any expression of opinion in the bulletin made with knowing falsity or reckless disregard of the truth or falsity thereof; and, (4) Is the subject matter of the bulletin a matter of public concern. Pretermitting consideration of all other inquiries, it is evident that whether the bulletin contained misstatements of fact and whether such misstatements were made with knowing falsity or with reckless disregard as to the truth or falsity thereof, are issues which cannot be decided on the face of the pleadings. For this reason alone, St. Paul's exception must be denied.

THE MERITS OF THE DEFAMATION ISSUE
Economy contends it was defamed by numerous telephone messages by BBB in response to consumer complaints; by the letters Ramirez wrote to Economy; by correspondence by Ramirez to the Governor's Office of Consumer Protection; and by communications to the Attorney General, State of Louisiana. We find that only the Special Bulletin of October, 1974 warrants consideration in this regard.
Mashburn establishes the following test to determine the difference between statement of fact and opinion: "the crucial difference. . . . depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker or writer's opinion, or as a statement of fact. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker did not intend to assert another objective fact, but only his personal comment on the facts which he had stated. An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff's conduct, qualification or character; or when both parties to the communication know the facts or assume their existence, and the comment is clearly based on the known or assumed facts in order to justify the comment." 355 So.2d 879, 885.
Employing the foregoing guidelines, we find that much of the text of the Special Bulletin, as well as the impressions and implications which may be drawn therefrom, constitutes opinion. After stating objective facts, including the use of BBB shoppers, reproducing the questioned newspaper ad, and mentioning results of findings based on visits to Economy's establishment, the publication states: "These facts combined raise serious questions concerning not only the accuracy of the company's advertising, but also the overall impression it creates . . . that is . . . locally made, mass-produced, low-priced carpets." The language is labeled as opinion *241 in that it is said to be the subject of some "question" or doubt by the BBB. We also find that the summary of the publication makes clear the nature of the comments by stating that the questions posed have been referred to the Governor's Office of Consumer Protection with the request that an investigation be made to "obtain proof of accuracy" or "demand corrective changes" in the questioned conduct. The purpose of the circular affords further support for the finding that the bulletin expresses opinion. Having no enforcement authority, BBB can only provide information, express an opinion on the information developed, advise the public as to protective measures when dealing with a particular establishment, then let the public make its own decision and draw its own conclusions.
Does the Special Bulletin contain misstatement of fact? Dale Ramirez, Vice President of BBB and James Kolter, President of BBB, substantiated the veracity or each factual statement in the bulletin. Both witnesses considered each sentence of the article individually and on the basis of their own knowledge and actions, and the testimony of other witnesses proved the truth of each separate statement standing alone. The more difficult question is whether the factual statements imply or insinuate illegal or immoral conduct on the part of Economy, which insinuations or implications were not true. We do not find this to be the case.
Economy produced innumerable witnesses who testified in effect that the bulletin was incorrect in its assessment of the amount of carpet produced by the single loom in Economy's warehouse. The bulletin does not attempt to assess or estimate the amount of carpet the loom could make. The bulletin merely points out the observations of BBB personnel who visited the warehouse and requested verification of the capacity of the loom. The bulletin does not imply that the loom cannot produce carpet as claimed by Economy, but that Economy failed to respond to BBB's numerous requests for verification of loom capacity or capability to manufacture "thousands and thousands of yards of carpet", and that in BBB's opinion, Economy should prove its claim. The title of the bulletin and remarks contained therein indicate clearly that BBB is addressing questions to Economy and that the questions should be answered in the interest of fair advertising and honest business practices. We find that the impression the article is fairly calculated to produce, and the impression it would naturally engender in the mind of an average person is that BBB has raised questions concerning the accuracy of Economy's advertising that Economy manufactures a considerable amount of the carpet it sells, and that the claim should be investigated.
Were the expressions in the bulletin malicious, meaning were they knowingly false or made with reckless disregard as to their truth or falsity? The burden of proof rests upon Economy in this regard. Admittedly, the burden is onerous. Essentially, Economy attempted to establish that the bulletin was not published to question or challenge Economy's business practices, but was intended to drive Economy out of business because Economy was not a BBB member. We find the record totally devoid of evidence to substantiate this contention. On the contrary, the proof preponderates overwhelmingly in favor of the conclusion that the bulletin was issued solely to make available to BBB members and consumers the information which BBB had developed concerning Economy in order to promote knowledgeable dealing with Economy by prospective' purchases of carpeting. This finding of fact does not require our finding manifest jury error herein. In instructing the jury, the trial judge did not have the benefit of Mashburn, and the jury was not instructed in the light of Mashburn's interpretation of the "fair comment" privilege afforded by the First Amendment of the United States Constitution. On the contrary, the interrogatories presented the jury included one that requested a finding of whether or not BBB was at "fault".
*242 Is the subject matter of the bulletin a matter of public concern? The information was provided with regard to a merchant who engaged in extensive advertising in the news media with the object of attracting prospective purchasers and customers to his establishment and thereby increasing his sales and profit. We find a business enterprise so conducted is a matter of public concern and interest. Applying the principles of Mashburn to the case at hand, we find the Special Bulletin in question was privileged as "fair comment" and that Economy's claim for damages for defamation must be rejected.

RESTRAINT OF TRADE
In essence, Economy maintains that the action of BBB in publishing the Special Bulletin, giving alleged adverse, critical and defamatory information in response to consumer inquiries, referral of the matter to the Attorney General's Office for investigation, and sending BBB shoppers to Economy's establishment, taken as a whole, constitute a calculated intent, scheme and effort to run Economy out of business and therefore amounts to a violation of La. R.S. 51:122.
The alleged conspirators are the subject of some confusion inasmuch as defendants alleged to have been co-conspirators have been voluntarily dismissed from this action, leaving BBB as the sole alleged conspirator. This confusion was somewhat enhanced by the trial judge's refusal to grant Economy's requested charge that a conspiracy could result from the action of BBB employees conspiring among themselves, and that to prove conspiracy, it was not necessary that Economy establish that BBB employees had conspired with corporations or persons other than BBB employees. The jury found that BBB did not "conspire with anyone, named or unnamed . . . to restrain trade and/or commerce as it might affect the plaintiff." Economy contends that the instruction given improperly limited recovery on the restraint of trade issue because BBB could have conspired with its own employees and the instruction given did not allow such a finding. Appellants argue that the instruction was proper because Economy's contention necessitates a finding that BBB as a corporate entity can conspire with individuals. Realistically, a corporation acts through, not with, its officers and employees.
La. R.S. 51:122 provides that:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal."
Economy argues that the statute does not require proof of evil motive or specific intent to restrain trade if such restraint is a necessary consequence of the questioned acts. The statute and jurisprudence, however, indicate clearly that the purpose of the acts must have been to restrain trade. See Tooke & Reynolds v. Bastrop Ice & Storage Co., Inc., 172 La. 781, 135 So. 239 (1931).
We find it was error for the trial judge to refuse Economy's requested instruction concerning conspiracy. We also find, however, that the error was harmless in view of the proof offered by Economy to establish the conspiracy charge. We find as a fact that Economy has failed utterly to establish conspiracy on the part of BBB employees, either among themselves or in consort with others. Had the requested instruction been given, there is no credible evidence of record on which the jury could have found conspiracy in this instance.
To establish the alleged conspiracy, Economy relies upon testimony regarding: (1) alleged solicitation of complaints by Ramirez; (2) alleged attempts by BBB Board member Richard Lipsey to compel an advertising agency to drop Economy's account; (3) complaints to BBB from a BBB member concerning Economy's advertising practices; (4) alleged erroneous information imparted *243 to consumer inquiries when such information was based on only one consumer telephone complaint; and (5) publication of the October, 1974 bulletin.
Economy claims complaints were solicited from Joe Alcocer and Mrs. Jo Ann Monte. Mr. Alcocer's testimony is disputed by Ramirez. Mr. Alcocer, a tailor, was a former tenant of Ramirez. Alcocer testified that Ramirez requested him to pretend to shop at Economy and then file a complaint with BBB regardless of the results of the visit. Ramirez testified that on an occasion when he spoke with Alcocer concerning rent money that Alcocer owed him, Alcocer solicited information from Ramirez about carpet firms because Alcocer intended to purchase some carpeting.
By coincidence, Mrs. Monte was shopping at Economy on one of Ramirez' visits to that concern. Ramirez overheard Mrs. Monte's verbal complaint to a clerk to the effect that she was unable to purchase an advertised article. Ramirez suggested that Mrs. Monte write a complaint to BBB. Although Ramirez approached Mrs. Monte and inquired what the clerk had told Mrs. Monte about the advertised article, there is no evidence that Ramirez solicited or importuned Mrs. Monte to make a complaint.
Richard Lipsey, a BBB Board member, criticized one of the partners of an advertising firm for handling Economy's advertising. Mr. Lipsey is not a competitor of Economy; he is engaged in an entirely different line of endeavor. As an individual, or even a member of the BBB Board, Mr. Lipsey was free to make such criticism, if he chose. No ulterior motive on the part of Mr. Lipsey was shown. More importantly, the record is barren of proof that any other officer or any employee of BBB was aware of Lipsey's action, or conspired with Lipsey in any fashion whatsoever.
As additional evidence of alleged conspiracy, Economy showed that Sam Lacour, a BBB member and one of Economy's major competitors, complained to BBB about Economy's advertising. Economy also established that BBB reported to inquirers that Economy required payment in full for carpeting before installation, which information was based on one consumer telephone call. Such incidents provide no substantiation for the charge that they were intended or had as their purpose the restraint of trade.
The testimony of Dale Ramirez and James H. Kolter (President of BBB from January 1, 1966 to September 15, 1975), is that the letter inquiries to Economy, the BBB shopping at Economy's store, and publication of the Special Bulletin were merely additional efforts to discharge BBB's function of informing the public. They explained that the referral to the Governor's Office of Consumer Protection and the State Attorney General were warranted because of Economy's persistent refusal to respond to the written inquiries and furnish satisfactory proof of the claim that Economy was a large manufacturer of carpeting and could therefore undersell its competitors. They also testified that had Economy answered the questions posed and furnished the information desired, the Special Bulletin would not have been published and that the Attorney General would not have been requested to investigate Economy. We conclude that the record fails to establish the alleged conspiracy.
The judgment awarding Economy $30,000.00 in damages for defamation is reversed and set aside and judgment is rendered herein in favor of BBB and St. Paul dismissing said claim, with prejudice. The judgment rejecting Economy's claim for alleged restraint of trade is affirmed and judgment is rendered herein rejecting Economy's claim in toto, all costs of these proceedings to be paid by Economy.
Affirmed in part, reversed in part and rendered.

[See following illustration]
*244 
*245